117 So.2d 104 (1959)
Mrs. Cecelia LeBlanc DAY, Individually and as Tutrix,
v.
NATIONAL-U. S. RADIATOR CORPORATION et al.
No. 4852.
Court of Appeal of Louisiana, First Circuit.
October 15, 1959.
Rehearing Denied January 20, 1960.
*107 H. Alva Brumfield, Baton Rouge, for plaintiff-appellant.
Watson, Blanche, Wilson, Posner & Thibaut, David W. Robinson, Baton Rouge, for defendants-appellants.
Theo F. Cangelosi, Jos. A. Loret, Kantrow, Spaht, West & Kleinpeter, Taylor, Porter, Brooks, Fuller & Phillips, Robt. Vandaworker, Durrett, Hardin, Hunter, Dameron & Fritchie, Breazeale, Sachse, Wilson & Hebert, Kizer, Heaton, Craig & Cangelosi, Dale, Richardson & Dale, Baton Rouge, for appellee.
Borron, Owen, Borron & Delahaye, Baton Rouge, for intervenor.
Sanders, Miller, Downing, Rubin & Kean, Wex S. Malone, Baton Rouge, for Architects Ass'n of American Inst. of Architects, amicus curiae.
Before ELLIS, LOTTINGER, TATE, FRUGE and LANDRY, JJ.
LANDRY, Judge.
This is an action in tort in which plaintiff, Mrs. Cecelia LeBlanc Day, the duly qualified natural tutrix of her minor children, Judy Dianne Day and Randall Joseph Day, seeks to recover the sum of $255,058.28, individually, and the sum of $155,600 for the use and benefit of each of her said minor children, as damages for the alleged wrongful death of Willie D. Day, husband of plaintiff, Cecelia LeBlanc Day, and father of said minors, who died March 24, 1956, of burns received in a boiler explosion the previous day while installing a domestic hot water system in a New Patients Building at Greenwell Springs Hospital, East Baton Rouge Parish, Louisiana, for his employer, Vince Plumbing Company, subcontractor of Charles Carter & Company, Inc., prime contractor on the hospital project.
Named as defendants herein are Wilson & Coleman, a partnership composed of John F. Wilson and Robert N. Coleman, architects who designed the building; Philip Arnold (by stipulation substituted for Lloyds of London, liability insurer of Wilson & Coleman); Chesson, Forrest & Holland, a partnership composed of Don W. Chesson, Joel L. Forrest and Albert W. Holland (consulting engineers employed by the architect to design certain mechanical equipment for the project); National-U. S. Radiator Corporation, a Pennsylvania corporation; Minneapolis-Honeywell Regulator Company, a Delaware corporation; McDonnell & Miller, Inc., an Illinois corporation; Penn Controls, Inc., an Indiana corporation; White Rodgers Electric Company, a Missouri corporation and Jacuzzi Brothers, a Missouri corporation, manufacturers of various items of equipment used on the domestic hot water system, the boiler of which exploded and gave rise to this litigation. Also made defendants were Indemnity Insurance Company of North America and Liberty Mutual Insurance *108 Company, liability insurers of National-U. S. Radiator Corporation and Penn Controls, Inc., respectively.
In the lower court a petition of intervention was filed on behalf of North River Insurance Company, a New York corporation, compensation insurer of Vince Plumbing Company, through which means said intervenor is seeking recovery from defendants of medical expense in the sum of $537.60 paid in the treatment of Day's injuries and such amount, not exceeding $9,000, as it has paid or will hereafter pay plaintiff in compensation benefits for the death of her husband.
In substance the petition alleges decedent was employed by Vince Plumbing Company which concern was holder of a plumbing and heating sub-contract from Charles Carter & Company, Inc., prime contractor on the building in question which was being constructed by the State of Louisiana through the Louisiana State Building Authority. It is further alleged that pursuant to its sub-contract, Vince Plumbing Company installed in the building two different and distinct systems involving the use of boilers, one being known as a central heating system (designed to heat the building during cold weather) and the other designated as a domestic hot water system (intended to provide hot water for use in lavatories, bathrooms and other facilities in the hospital). Plaintiff alleges that after the domestic hot water system was installed in accordance with the plans and specifications of the architect and the instructions and directions of the manufacturer of the boiler used, the system was lighted and shortly thereafter the boiler exploded inflicting burns upon her husband from which injuries he died. The petition recites the cause of the accident is unknown to petitioner for which reason she specifically pleads and invokes the doctrine of res ipsa loquitur. However, in the alternative, petitioner charges the explosion resulted from faulty design of the domestic hot water system by the architects and engineers and failure of the architects and engineers to properly supervise installation of the system. In addition, plaintiff alternatively charges each of the remaining defendants with having negligently designed and constructed the respective pieces of equipment used on the system and having negligently constructed same of defective materials so that the numerous apparata failed to properly function and cause the boiler to explode even though the system was assembled and installed in a workmanlike manner and in compliance with the plans and specifications drawn by the architects and engineers.
Exceptions of no cause and no right of action were filed on behalf of defendants Chesson, Forrest & Holland and overruled by the trial court.
Defendant Century Electric Company filed an exception of no cause of action and a plea of one year's prescription, both of which were overruled by the lower court.
An exception to the jurisdiction ratione personae was filed on behalf of Penn Controls, Inc., based on the contention it was not doing business in the State of Louisiana. For written reasons assigned, the Judge of the lower Court first sustained this exception but on rehearing the matter reversed his decision and overruled said exception whereupon Penn Controls, Inc. answered with reservation of its exception which it now urges for our consideration.
Defendants Wilson & Coleman and Chesson, Forrest & Holland answered denying any negligence on their part and specifically denying that the domestic hot water system as planned by them was improperly designed or that the plans and specifications were inadequate and further denying that the explosion resulted from lack of supervision or failure to inspect the installation.
Answers were filed on behalf of the respective manufacturers made defendants herein each asserting in substance that the device furnished was properly constructed, free of defects and in good working order *109 and all further asserting the cause of the explosion to be the result of faulty and improper installation of the domestic hot water system by the employees of Vince Plumbing Company.
After lengthy trial in the lower court, judgment was rendered in favor of plaintiff in the sum of $39,204.68, individually, $9,500 as natural tutrix of the minor, Judy Dianne Day, and $10,000 as natural tutrix of the minor, Randall Joseph Day, against defendants Wilson & Coleman and Philip Arnold, in solido, and in favor of all remaining defendants dismissing plaintiff's action. The trial court also rendered judgment in favor of intervenor North River Insurance Company against plaintiff in the sum of $4,287.60, representing medical expense and compensation paid and $500 attorney's fees, and for such additional compensation as shall be paid plaintiff during the interval between the signing of said judgment in the trial court and execution thereof upon same becoming final and executory after appeal.
Defendants Wilson & Coleman and Philip Arnold have appealed the judgment against them asking that the decision of the lower court in this respect be reversed and set aside which appeals plaintiff has answered praying that the award against said defendants be increased.
Plaintiff has appealed the judgment of the lower court rejecting her demands against those defendants as to whom her claims were dismissed. In each instance plaintiff's appeal has been answered.
The conclusions herein reached with respect to the liability of defendant Penn Controls, Inc., obviates the necessity of deciding the jurisdictional question tendered by said defendant.
The exceptions of no right and no cause of action filed on behalf of defendants Chesson, Forrest & Holland have not been urged before us and are, therefore, considered abandoned. The exception of no cause of action and plea of prescription filed on behalf of defendant Century Electric Company must also be considered abandoned since neither has been urged on appeal.
The evidence shows that the Louisiana State Building Authority (hereinafter referred to simply as "Building Authority") desired to construct a new patients' building at the Greenwell Springs Tuberculosis Hospital, East Baton Rouge Parish, and engaged the services of defendants Wilson & Coleman, a firm of architects (hereinafter referred to simply as "architect") to prepare the plans and specifications for the facility. The contract between said Building Authority and architect, executed in 1954, provides that the architect undertakes to perform fully and to the satisfaction of the Building Authority certain professional services stated in the contract as follows:
"The Architect agrees to perform fully and to the satisfaction of the Owner all professional services as hereinafter set forth for the proper and economical planning and supervision of the above described work.
* * * * * *
"The professional services of the Architect shall consist of the general administration of the business and supervision of the work. The scope and quality of such services to be rendered are indicated in general by the following schedule:
* * * * * *
"2. Necessary conferences and preparation of proper and complete working drawings, and specifications for architectural, structural, plumbing, heating, electrical and other mechanical work; information for bidders, general conditions, proposal form, and other contract documents, all in ample and careful detail to permit close figuring by contractors making up bids therefrom, and to assist in the opening and tabulation of bids received by the Owner; also to obviate, if possible, any necessity for supplemental extras.

*110 "3. Necessary conferences and adequate supervision of the execution of the work to reasonably insure strict conformity with the working drawings, specifications, and other contract documents. This service shall therefore include the
"(a) establishment of all lines, levels and grades
"(b) inspection of all samples, materials, and workmanship
"(c) preparation of all necessary full-size detail drawings.
"(d) checking of all shop and setting drawings
"(e) frequent visits to the work site
"(f) checking of contractor's estimates, keeping of accounts, and the issuance of certificates of payment."
Provision was made in the contract of the architect for employment of licensed engineers to design and prepare plans for the electrical and mechanical work involved, the pertinent part of the contract reading as follows:
"Engineering Services:
"All engineering work under this architectural contract such as structural, electrical, mechanical, and/or other engineering shall be performed by licensed professional engineers, and said engineers or engineering firms shall have been first approved in writing to the Architect by the Owner before being authorized by the Architect to perform said engineering services."
In confirmity with the foregoing contractual provision, the architect (with the approval of the Building Authority) entered into a verbal contract with defendant Chesson, Forrest & Holland, consulting engineers (hereinafter referred to simply as "engineer") whereby said engineer agreed to prepare all plans and specifications for the electrical and mechanical work involved in the building. The evidence shows that all details of the electrical and mechanical aspects of the project were then prepared by the engineer, submitted to and approved by the architect and incorporated into the architect's general plans and specifications for the project.
Upon completion of the plans and specifications, a contract was entered into with Charles Carter & Co., Inc., for construction of the building. The contractor, in turn, negotiated a sub-contract with Vince Plumbing Company whereby the latter undertook performance of all mechanical work called for in the plans including heating, plumbing and electrical installations necessary to complete both the central heating system and the domestic hot water system.
Our concern is with the domestic hot water system only. The central heating system, an entirely separate unit, was not involved in the explosion.
The plans and specifications for the building (page 18 of the plans and pages 296 and 297 of the specifications) provide that the domestic hot water system shall consist of three integral parts, namely, a boiler to heat the water, a storage tank to serve as a reservoir for the heated water and a circulating pump assembly to keep the hot water constantly flowing in the system so that hot water would be available immediately upon opening any faucet or outlet without the necessity of waiting as in the case of the usual system found in the average modern home.
Page 18 of the plans contains the design or "layout" of the equipment room (a portion of the building dedicated to housing the various pieces of mechanical equipment needed to service the building). The plans indicate only the location or placement of the various pieces of mechanical equipment in the equipment room. No mention is made of the manner in which the component parts of the domestic hot water system are to be interconnected and neither is indication given as to the method by which the various control devices called for in the *111 specifications shall be connected to the electrical system or to the component part intended to be controlled thereby. The plans further show that the boiler and storage tank are to be erected on foundations of the same level of elevation.
The specifications found on pages 296 and 297 provide the following detail regarding the domestic hot water system:
"Hot Water Heaters:
"Furnish and install hot water heater and storage tank where indicated in the Equipment Room. Hot water heater shall be National Radiator model 7-33 or equal with a minimum capacity of 300 gallons per hour at 100 degree temperature rise. Provide 30" diameter by 6'6" long storage tank constructed in accordance with ASME code for unfired vessels. Boiler and storage tank shall be placed on 4" base of tile or concrete.
"Hot water heaters shall be complete with insulation, draft diverter, jacket, gas burner, safety pilot, thermostat, gas valve, magnesium alloy rod, etc. Equip hot water heaters with temperature and pressure relief valves and pipe same down to within six inches of the floor. Make gas connections and vent heaters through the roof with Metalbestos or approved equal vent pipe. Provide copper roof jacks and swivel vent caps at roof.
"Controlling Valves:
"All valves, stop cocks, waste cocks, connections, etc., shall be provided and installed wherever necessary and required by the Architect for controlling the different parts of the work. Valves shall be provided on all inlet and connections of all kinds of apparatus and fixtures, on all branch lines near the supply of groups of fixtures, etc. Provide valves in main water leads and also supplies to equipment. The supply of both hot and cold water to each fixture hereinafter specified shall be equipped with stop valves. All valves, cocks, etc., where chromium plated piping is used, shall be chromium plated to correspond.
"Hot Water Circulator:
"Furnish and install hot water circulator for the domestic hot water system. Pump shall be direct connected with mechanical seal. 1750 rpm, minimum 5 gpm at 35 ft. head, 1¼ R 1/3 hp. Weil or equal. Unit shall be controlled by immersion aquastat in return line 10 feet from pump."
The evidence shows that in cases of this character, it is customary for the subcontractor charged with responsibility for installation of mechanical equipment to submit to the engineer a "brochure" for approval before installing any equipment in the building, a brochure being a file containing a complete description of all equipment proposed to be installed by the plumbing sub-contractor including the brand, size and capacity of all equipment and such other information as will enable the engineer to determine that the equipment proposed to be installed meets the requirements of the plans and specifications. In addition, a brochure contains "shop drawings" which are said to be sketches indicating in detail the exact manner in which it is proposed to make the installation.
The evidence shows that upon obtaining his sub-contract, Vince submitted a brochure to the architect under date of June 19, 1955 (said brochure having been gratuitously prepared for Vince by Amstan Supply, a firm which sought to sell Vince the equipment in question). Upon receipt of the brochure, the architect forwarded it to the engineer who in a letter dated July 5, 1955, approved the brochure as submitted with certain exceptions which it is not necessary to detail. A second brochure was submitted to the engineer who disapproved same in a letter dated September 1, 1955, addressed to the architect, the reasons for disapproval being stated therein as follows:

*112 "We have reviewed the various brochures submitted to our office and the following are our recommendations:
"Plumbing Fixtures:
"We are returning herewith these brochures disapproved. We find that no corrections were made from the first submittal as outlined in our letter of comments of July 5, 1955.
"Heating Brochure
"Disapproved: Same comment as above.
"Ventilation
"Approved as re-submitted.
"Controls
"Additional information is requested as to catalog model and numbers. We will retain these brochures until this information is received."
It is undisputed that no further brochures were submitted to the engineer but on September 8, 1955, a third brochure was approved by John F. Wilson (member of the firm of Wilson & Coleman, Architects), by his endorsing the cover thereof as follows: "approved as noted, Wilson & Coleman, John F. Wilson, Sept. 8, 1955." The brochure as thus approved called for the following equipment to be installed:
 "Greenwell Springs Hospital
 "New Patient Building
 1C-613 American Standard Natural
 Gas Fired Boiler w/Standard Aut.
 Control for Hot Water
 1230M McDonald Miller ASME Relief
 valve
 120 × 65 80 gal. B & G ASME Expansion
 tank
 1ATF-18 B & G Airtrol tank fitting
 1ABF 3" ditto Boiler "
 1¾ # 12 " P. R. Valve
 1¾ " Simplex Valve
 13" S-2 Flo Control Valve
 1230M McDonald Miller ASME Relief
 Valve
 4 2" Swing Check Valves
 16W-33 Nat'l Gas Boiler w/H.W.
 Controls, 270 MBH Input as per
 plans & specifications.
 130 × 72 Vertical H. W. Tank black
 steel 100# W.P. ASME w/
 handhole and base ring cap. 220 gal.
 PUMPS A, B, AND C
 31¼A 1531 B & G Unibuild Cent.
 Pump, cap. 25 G.P.M. @ 40' head,
 208/3/60 ¾ H.P., 1750 R.P.M.
 PUMP D
 11¼A 1531 B & G Uni-Built Cent.
 Pump, 20 G.P.M. @ 30' head, ½
 H.P., 120/1/60, 1750 R.P.M."
Following approval of this brochure, Vince proceeded to order the equipment in accordance therewith. It appears that the equipment was received on the job some time before its actual installation. Vince contends installation was delayed because of his inability to obtain from the engineer instructions as to the manner in which the installation was to be made. According to Vince, he finally consulted Don W. Chesson requesting details regarding the manner in which the engineer desired the system to be connected. On this score there is a serious dispute between Vince and Chesson. Vince testified that upon requesting Chesson to sketch in detail the various connections involved, Chesson hastily drew a diagram on a piece of white paper indicating the manner in which the equipment should be connected and further designating that the water temperature control (Penn control) be placed on the storage tank and the temperature relief control (McDonnell-Miller 20 1 N.F. Control) be installed on top of the storage tank. Vince contends he knew the installation thus indicated would be dangerous and so informed Chesson. Vince further stated that despite his protests, Chesson persisted in instructing him to install the system according to the diagram, consequently, he ceased to argue the matter, took the diagram made by Chesson, gave it *113 to his employee, Burkett, with instructions to make the connections as shown thereon and made known to Burkett his futile protests to Chesson. The testimony of Vince on this score is vigorously denied by Chesson who stated that Vince requested information concerning only the manner of connecting the return line to the cold water inlet line and Chesson obliged him by drawing a sketch of this particular connection. Chesson stoutly denied having drawn a sketch of the entire system and also denied having told Vince to disregard the plans and specifications and made the installation according to the sketch as was testified by Vince. He positively denied having instructed Vince to eliminate either the pressure relief valve or high limit temperature controls required by the specifications to be placed on the boiler.
The evidence shows the water pressure in the hospital water supply system is 45 pounds per square inch and that, on the day of the explosion, the temperature of the water was approximately 70 degrees Fahrenheit. On the day preceding the explosion, the system was lighted by Vince and allowed to burn a few minutes to test the burner. It was discovered the pump was leaking and the boiler was then turned off. On the morning of the explosion, Burkett, an employee of Vince prepared to make further tests but found the pump was still leaking at which time he disconnected the pump after having closed the gate valves on each side of the pump. After repairing and replacing the pump, Burkett reopened the two gate valves, lighted the fire in the boiler and about 15 or 20 minutes thereafter left the boiler room to attend to duties elsewhere in the building. Upon leaving the equipment room, Burkett noted the temperature of the water to be 90 degrees and the pressure 45 pounds. Approximately 10 to 20 minutes after Burkett departed, the explosion occurred. Decedent, Willie Day, who remained in the equipment room with one Grantham on Burkett's orders, was standing near the boiler when it exploded and was scalded with live steam. Grantham, who was on top of the boiler of the central heating system, was not injured. Grantham testified the pump was in operation at the time of the explosion.
We deem it advisable at this point to describe in detail the domestic hot water system as actually installed by Vince. The boiler in question, a National-U. S. Radiator Co. boiler with a capacity of 30 gallons, a working pressure of 50 pounds per square inch and a heat output of 216,000 BTU per hour, was fed cold water from the hospital water supply by means of a 3-inch pipe which entered the boiler near the bottom. The flow of cold water into the boiler was controlled by two valves, one being known as a globe valve and the other being referred to as a check valve. The globe valve was located on the cold water inlet line some few feet from the boiler. This particular valve was constructed so that it would remain open to any desired extent thereby controlling the volume of water flowing into the boiler. Between the globe valve and the boiler was situated the check valve, a control mechanism designed to permit water to flow only in one direction. The check valve was installed so that it permitted water to flow only from the cold water supply into the boiler and prevented water from flowing out of the boiler or "backing up" into the supply line. The boiler was designed to burn natural gas and to supply the necessary fuel for its use it was connected to the gas supply. On the gas supply line near the boiler was placed a control device known as a White Rodgers gas diaphragm valve whose purpose was to control the supply of gas entering the heating element of the boiler and constructed to operate on electrical current. Its mechanism was such that upon receiving electrical current, it opened to permit gas to flow into the burner and when not receiving current, it closed and shut off the gas supply causing the burner to go out. From the top of the boiler emerged a 1-inch pipe which ran horizontally for 5 or 6 feet then turned at a right angle and extended *114 downward a distance of 33 inches (in what is known as a "reverse loop") and entered the lower portion of the storage tank which was erected on the same level as the boiler and consisted of a steel tank having a capacity of 220 gallons and a working pressure of 100 pounds. On top of the storage tank was placed a McDonnell Miller 201 temperature relief valve designed to sense the temperature of water and operate on a system with a maximum pressure of 125 pounds per square inch. This McDonnell-Miller valve was set to commence opening when the water in the storage tank surrounding its sensing element reached 188 F. and to fully open when the water reached 208 F. The valve was connected to a pipe which descended to the floor and through which water escaping from this particular control could be discharged as waste.
Situated on the side and near the top of the storage tank was a control known as a "Penn Control", a temperature sensing device commonly referred to as a "thermostat" and whose purpose is to control the flow of electrical current. It is so constructed that its settings can be selected by the user and functions in such manner that when the temperature of the water at the device reaches a pre-determined setting, the control opens or closes its contact points to make or break an electrical circuit. The purpose of this particular control was to regulate the temperature of the water in the storage tank so that excessively hot water would not be permitted to enter the distribution lines. The Penn control was set to open (make an electrical circuit) and energize the White-Rodgers gas valve and call for more fire to reheat the water when the temperature of the water in the storage tank fell to 150 degrees and close (break the electrical circuit) and shut off the White Rodgers valve thereby putting out the fire when the temperature of the water in the storage tank reached 165 degrees. The storage tank was connected to a network of distribution lines which ran to the various outlets in the building. The system also included return lines whose function was to return the water to the boiler for reheating when necessary. Near the boiler was situated the pump assembly consisting of a circulating pump manufactured by defendant Jacuzzi Brothers, an electric motor, a product of defendant Century Electric Company, and a Minneapolis-Honeywell control (known as an aquastat). The function of the pump was to provide force or energy to circulate the water in the system thus insuring a supply of hot water at all outlets at all times; it was placed at the end of the system where the water was coldest. As previously stated the pump kept the water flowing in the system, the electric motor supplied the power to operate the pump and the aquastat controlled the supply of electricity to the motor. The aquastat was set to start the motor and run the pump when the temperature of the water at this device reached 140 degrees. It is conceded the aquastat was constructed to operate at a 5-degree variable so that being set to function at 140 degrees it would actually turn the pump on when the temperature fell to 135 degrees and shut the pump off when temperature of the water at this control rose to 145 degrees. When the pump was in operation it would cause the water to flow and circulate throughout the system; whenever the temperature of the water fell below the setting of the aquastat the pump would commence operating causing the water to flow through the boiler for reheating and when the temperature at the aquastat again reached the desired setting the pump would cease operation thereby conserving electricity. After passing through the pump the water reentered the cold water supply line at a point between the check valve and the boiler from whence it flowed into the boiler for reheating. Situated on the return line (on either side of the pump assembly) Vince placed gate valves which enabled this line to be completely closed thereby isolating the pump and permitting its removal for replacement or repair. At each of the 58 outlets on the system there was *115 installed an air chamber consisting of a 12-inch length of 1-inch pipe intended to provide additional accommodation for the increase in volume and pressure resulting from the heating of the water in the system. It is conceded by all parties that no pressure relief valve or temperature relief control was placed on the boiler of the domestic hot water system as called for in the specifications.
The evidence shows that the system, when filled with water, is what is known in engineering terminology as a "closed system" which we are given to understand means that employment of the check valve on the cold water supply prevented the water and pressure in the system from backing up out of the system into the cold water supply line thus eliminating gravity flow or circulation in the system and making the system entirely dependent upon the pump for circulation therein.
The testimony of certain expert witnesses reveals that once such a system is filled with water it remains full until water is drawn off whereupon the check valve would open and replace the water used. Once the system was full, water could not leave the system except through one of the outlets since the check valve prevented water from running out through the supply line. Once the electrical current was turned on, the system filled with water and the pilot light ignited the White Rodgers gas diaphragm solenoid valve would then control the flow of gas into the burner depending upon whether or not it was receiving electrical current from the Penn control situated near the top of the storage tank. When the electricity was turned on (the water in the system being approximately 70 degrees and the Penn control being set to call on the White Rodgers valve for gas when the temp of the water fell to 150 degrees or below) the Penn control would energize the White Rodgers Gas valve causing it to open and the burner to commence heating the water. At the same time the boiler began its heating process, the circulating pump would begin operating considering the control mechanism (Minneapolis-Honeywell control) was set to start the pump motor when the temperature of the water at this control fell to 135 degrees. With the boiler in operation and the pump circulating the water at the rate of 10 gallons per minute (the evidence showing this to be the capacity of the pump), the flow of water through the boiler and entire system was constant so that each minute 10 gallons of water would flow into and out of the boiler after having absorbed heat in the process of passing through. As the water left the boiler, it would mix with the colder water in the storage tank and distribution lines stabilizing the temperature of the water throughout the system. When the temperature of the water in the storage tank reached 165 degrees, the Penn control would operate to cut off the fire and prevent the temperature of the water from exceeding 165 degrees. If, for any reason, the Penn control did not operate and failed to cut off the gas supply when the temperature of the water in the storage tank reached 165 degrees, the fire would continue to burn until the temperature reached 188 degrees at which time the McDonnell-Miller temperature relief valve on the storage tank would begin to open and relieve the system by permitting water and pressure to escape. If the fire still continued to burn, the McDonnell-Miller device would continue to open slowly until, when the water reached 208 degrees, it would be fully open and discharge water to its fullest capacity, simultaneously relieving pressure. Once the temperature of the water in the entire system reached 145 degrees, the pump would cease operation for the temperature of the water at its control (the Minneapolis-Honeywell device) would equal its pre-determined setting and the device would cause the electric motor to cut off. The pump would not resume operation until the water at its control fell to 135. Since the Penn control (which controlled the fire in the boiler) was installed on the storage tank instead of the boiler, the flow of gas into the boiler burner *116 was controlled by the temperature of the water in the storage tank and not the temperature of the water in the boiler itself. The same condition applied to the McDonnell-Miller temperature relief control since it was also situated on the storage tank and not the boiler.
Having set forth the circumstances surrounding the accident and the manner in which installation of the domestic hot water system was accomplished, we now consider plaintiff's contention that the doctrine of res ipsa loquitur is applicable to the case at bar and all defendants must be held liable unless each establishes freedom from negligence.
Counsel for all defendants contend the doctrine of res ipsa loquitur sought to be invoked herein by plaintiff is inapplicable to the situation presented because for the rule to become operative it must be shown that a duty of care was owed with respect to the injured party and additionally because the instrumentality involved was not under the control of any defendant but rather under control of a third party who is not a defendant, namely, Vince Plumbing Company.
As stated in Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389, and reiterated in Minton v. Continental Insurance Company, La.App., 110 So.2d 789, recently decided by this court, the issue of determination of a proper instance for application of the rule of res ipsa loquitur has been the source of much judicial discussion but it is generally agreed that the principle is to be applied only to accidents happening under circumstances wherein plaintiff cannot reasonably be expected to know the cause thereof and involving events which do not normally occur except for negligence on the part of some one. Extensions, ramifications and refinements of the basic concept of the res ipsa loquitur doctrine have been indulged in by numerous jurisdictions but the weight of authority supports the proposition that the doctrine is a rule of evidence predicated upon the theory that the circumstances under which such instances occur are such as to give rise to an inference of negligence but does not modify the basic rule that negligence will not be presumed. Application of the rule does not dispense with the necessity that plaintiff prove negligence but it gives rise to a presumption in favor of plaintiff in the nature of an advantage which defendant is required to offset. Even when the rule is invoked it means simply that when all the evidence is introduced the question still remains whether the preponderance of the evidence is in favor of plaintiff.
That the doctrine is applicable to boiler explosions has previously been decided in this state. In Lykiardopoulo v. New Orleans & C. R. Light & Power Co., 127 La. 309, 53 So. 575, 576, which involved the death of an employee killed when a boiler tube exploded, the following language appears:
"That rule is of peculiar applicability in cases of boiler explosions. Thus, negligence may be inferred from the fact of the explosion of the boiler of the vessel, although the defendant is under no contract obligation to protect the plaintiff."
The ruling in the Lykiardopoulo case was reaffirmed in Drago v. Dorsey, 13 La.App. 115, 126 So. 724, in which case a three year old child was killed when an explosion on defendant's premises caused a board fence to fall upon the child as he was walking along the sidewalk accompanied by his aunt. In the Drago case, the court held the doctrine of res ipsa loquitur applicable and cited with approval the holding in the Lykiardopoulo case.
In the early application of the doctrine of res ipsa loquitur control of the offending device by defendant was considered essential and in some jurisdictions an absolute necessity. The requirement of control was apparently predicated upon the theory that physical possession and control *117 at the time of injury placed the defendant in the best position to know the cause of the accident thereby justifying imposition upon him of the burden of explanation. However, the possession rule has been relaxed in many jurisdictions and even eliminated as to certain types of occurrences principally among which are those involving explosions of bottled carbonated beverages and containers of gas and liquids under pressure. Control by defendant appears no longer to be an absolute requirement provided the other factors usually required are present, chiefly among which are the absence of knowledge on the part of the injured party concerning the cause of the incident and the superior ability of defendant to explain the occurrence. Numerous jurisdictions now hold that control by the defendant is not required if the accident is of such nature that incidents of the type involved do not normally occur except for negligence and plaintiff may not reasonably be expected to know or explain the cause of his injury or the nature of defendant's negligence. Assuming (for the sake of argument only) control of defendant over the instrument in question to be a necessity, it is apparent from the evidence the defendant architect was not without some measure of control had the duty of inspection and supervision been properly performed. Although immediate control and possession of the boiler and system was invested in the plumbing sub-contractor, it was the duty of the architect, either personally or through the consulting engineer, to exercise such control and supervision of the system that its construction and completion fulfilled the contract plans and specifications. Failure of the architect to discharge the duty of control assumed and imposed by his contract with the owner cannot be asserted as an absence of control relieving the architect of the consequences of negligent omissions.
In view of the circumstances of this case, we conclude the doctrine of res ipsa loquitur to be applicable and plaintiff entitled to the legal inference resulting therefrom.
Learned counsel for the architect contends that even if the rule of res ipsa loquitur should apply herein, the architect may nevertheless not be held liable even if found negligent because the alleged negligence is asserted to consist of failure to discharge a contractual obligation to a third party, namely, Louisiana State Building Authority, and non-performance of a contractual obligation does not create a cause of action in favor of a third person unless such non-performance constitutes breach of a duty owed the third party. In this connection, astute counsel for the architect points out the contract between architect and owner provides that in consideration of a stipulated fee of 6% of the cost of the project involved, the architect undertakes the obligation of preparing plans and specifications for the building and supervising construction of same to the end the building would be completed in accordance with the owner's wishes as reflected by the plans prepared by the architect.
The contract between architect and engineer was verbal and the evidence is undisputably to the effect their agreement was the engineer would be paid a fee of 3% of the cost of the mechanical and electrical work involved in the building with the remaining 3% of the fee to be retained by the architect. The evidence further shows that for the fee received, the engineer undertook to perform the usual and customary duties of visiting the building site to become familiar with existing conditions which influence the work, preparing detailed plans and specifications for all mechanical and engineering equipment to be incorporated in the building, consulting with and advising the architect as to the proper mechanical and electrical equipment for the building to best suit the requirements of the owner, examining and reporting to the architect on all shop drawings submitted by the contractor or sub-contractor, inspecting all underground installations constituting part of the *118 mechanical equipment before such installations are covered by the flooring, inspecting the job before the walls and ceiling were closed in and report to the architect as to the status of mechanical and electrical apparata therein enclosed, making a final inspection and report to the architect when the general contractor has reported the job complete and making such additional inspections and reports thereon as may be requested by the architect. In this connection, the testimony of the architect further indicates the engineer was under no obligation to make any inspections other than those hereinabove enumerated unless specifically requested to do so. Considering the terms of the contract between owner and architect and between architect and engineer, the basic and primary obligation of supervision was assumed by the architect who undertook the duty of performing same through the agency of the engineer.
Counsel for the architect and engineer contends the contracts of their respective clients clearly show the duties therein undertaken were in the case of the architect owed only to the Louisiana State Building Authority and in the case of the engineer owed only to the architect and no duty was owed to decedent or any other employee of any sub-contractor employed in construction. Learned counsel contend protection of such employees was not an objective of either the contract between the Building Authority and the architect or that between the architect and the engineer.
In this connection, principal reliance is placed upon the case of Adams v. Fidelity & Casualty Company, La.App., 107 So.2d 496, decided in this circuit, in which it was held that breach by corporate officers of an obligation due and owing only to the corporation, whether misfeasance, malfeasance or nonfeasance does not give rise to a cause of action by a third party against the corporate officers individually unless there is breach of a legal obligation owed by the corporate officers to the party injured. Counsel for plaintiff contends in effect that the rule announced in the Adams case, supra, is not applicable but rather the instant case falls within the line of jurisprudence established by the Supreme Court of this state in Marine Insurance Company v. Strecker, 234 La. 522, 100 So.2d 493, in which it was held the tenant of an owner of a building could maintain an action in tort against a contractor to recover damages occasioned by the fall of a cabinet installed by the contractor for the owner. In the Strecker case, supra, our Supreme Court reviewed the entire question of tort liability predicated upon the so-called "privity doctrine" or existence of contractual relationship between parties as a condition precedent to imposition of liability for negligent injury. In the Strecker case, supra, it was pointed out that deviation from the ruling of the celebrated Winterbottom case commenced with MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L. R.A.1916F, 696, which decision established jurisprudence to the effect the manufacturer of an automobile is responsible to the ultimate consumer or user thereof for injuries resulting from defects in manufacture which responsibility was therein predicated not on contract but upon the relationship between the parties and the foreseeability of harm to the consumer resulting from the placing of a defective product on the market. Applying the doctrine of the MacPherson case to the question of liability of a contractor to a tenant of the owner of a building constructed by the contractor, our Supreme Court noted that some jurisdictions have held contractors liable to third parties upon the basis privity could be assumed where use by the individual plaintiff was intended or reasonably to be anticipated. It was further pointed out in the Strecker case, supra, that with respect to contractors the analogy of the MacPherson case, supra, was finally being accepted and recent decisions have placed building contractors in the same category as sellers of goods holding them to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by the contractor's negligence, even after acceptance of the work by the owner.
*119 We believe the ruling in the Adams case, supra, decided by this court subsequent to rendition of judgment in the Strecker case, supra, is consistent and compatible with the holding in the Strecker case. It will be noted that in the Adams case this court in effect held an officer of a corporation is not responsible to a third party for breach of an obligation owed the corporation unless the action complained of also constituted breach of an obligation owed the injured party. We also held in the Adams case that breach by a corporate officer of an obligation owed the corporation which also amounts to breach of an obligation owed a third party gives rise to a cause of action for the damages occasioned thereby irrespective of whether such damages results from malfeasance, misfeasance or nonfeasance. The Adams case simply held that a corporate officer owes a duty to the employee of a contractor to protect the employee from danger caused by allowing a large iron reel weighing approximately 500 pounds to remain perilously atop a stack of steel so that it fell upon a workman descending from a tank to the ground by way of the steel stack.
Counsel for plaintiff maintains the effect of the Strecker decision is to impose liability under Articles 2315 and 2316 of our Revised Civil Code whenever fault is shown and injury results therefrom regardless of the relationship between the parties and irrespective of whether there exists a duty of care toward the party injured. We do not so interpret the decision in the Strecker case, supra, and do not believe it to be as broad or far reaching as does illustrious counsel for plaintiff. We believe the Strecker case, supra, limited to the proposition that privity of contract between a contractor and a third party is not necessary for the third party to recover in tort for damages sustained as the result of the negligence of the contractor in constructing a building regardless of whether the injury occurs before or after acceptance of the building by the owner. We believe the Strecker case, supra, merely holds that lack of contractual relationship between the contractor and the injured third party may not be asserted as a valid defense in such cases because the contractor owes the general standard of reasonable care for the protection of all who may be foreseeably endangered by his negligence and the tenant of an owner of a building constructed by the contractor is within the category of those whose injury may foreseeably result from the contractor's negligence. The holding in the Strecker case, supra, is but stating in another form the ruling we announced in the Adams case, namely, breach of an obligation to one's principal gives rise to an action in favor of a third party to whom a duty of care is also owed, the duty of care in the Strecker case being imposed because of the foreseeability of injury to the third party involved.
We see no valid reason for excepting architects and engineers from the ruling announced in the Adams and Strecker cases. The rules therein established for testing legal liability to third parties resulting from acts undertaken in a purely representative capacity must, of necessity, be uniform and without exception and apply to persons in all categories whether contractor, manufacturer, architect, engineer or otherwise. If a duty was owed decedent Day by the architect and engineer in the case at bar the same as a duty was found to exist toward the employee in the Adams case and the tenant in the Strecker case, then and in that event the same criteria of liability must be applied herein.
In view of the circumstances herein shown, we believe a duty existed on the part of the architect to use reasonable care toward the contractor and his employees as well as the various sub-contractors and their employees whom the architect had every reason to anticipate would be involved in the construction of this particular project. An architect employed to prepare plans for and supervise construction of a building or facility is not the insurer of the safety of workmen engaged *120 in performance of the work. However, an architect undertaking to render such services with respect to a dangerous instrumentality must exercise reasonable diligence and care under the circumstances to protect against injury to those who may be reasonably foreseen to be imperiled by defective or improper construction or lack of adequate supervision. It is self-evident no criteria may be established by which the duty of reasonable diligence and care may be measured in every instance. Obviously such determination must be made in the light of the circumstances of each individual case. In the case at bar the architect was fully aware that part of the mechanical equipment called for by the plans and specifications consisted of a domestic hot water system containing numerous parts including a boiler which if improperly or negligently installed would become dangerous. The architect was fully cognizant of the fact that employees of the contractor and sub-contractor would be called upon to construct, assemble and place in operation a potentially dangerous instrumentality designed and created by their agent, the engineer. An employee of the plumbing sub-contractor called upon to install such a mechanism is obviously one whose presence during installation is reasonably to be foreseen and whose injury should be anticipated in the event the normal hazards attending such installation were increased because of the negligence of either the architect or the engineer. It was reasonably foreseeable that a workman called upon to assemble and place the system in operation would be exposed to latent hazards and perils occasioned by faulty or improper design and unseen risks arising from lack of supervision permitting the instrumentality to be placed in operation without full compliance with all safety features provided for by the plans and specifications.
With the foregoing pronouncements in mind, we shall now proceed to consider the evidence to determine whether defendants have successfully rebutted the inference of negligence arising from our finding that the doctrine of res ipsa loquitur is applicable and also whether or not the record establishes negligence on the part of any or all defendants herein.
The allegations of negligence relied upon by plaintiff are set forth in Paragraph 20 of plaintiff's petition. In essence, defendants Wilson and Coleman and Chesson, Forrest & Holland are alleged to have negligently prepared the plans and specifications for the project and negligently failed to inspect and supervise installation of the domestic hot water system. The negligence of the remaining defendants is asserted to be faulty design and construction of each component part of the system and the use of defective material in the fabrication of each said part.
In oral argument and brief learned counsel for plaintiff contends the negligence of the architect and engineer with respect to design and preparation of plans and specifications consists of their mutual failure to provide detailed drawings indicating the manner of connecting the system; failure to require the storage tank to be elevated in relation to the boiler to promote gravity flow between the tank and boiler; directing the cold water supply to enter the boiler instead of the storage tank; failure to provide for a return line between the storage tank and boiler; failure to provide for an expansion chamber; directing the use of a boiler having a working pressure of 50 pounds per square inch on a system having a natural pressure of 45 pounds per square inch thus providing a safety factor of only 5 pounds per square inch and failure to provide for safety devices on the boiler.
At this juncture we are prompted to set forth certain technical scientific principles which all parties concede to be applicable to the system as constructed and from which certain agreed conclusions may be drawn.
According to the various expert witnesses who testified in the case, namely, *121 Dr. George F. Mathes, Professor of Mechanical Engineering and Head of the Mechanical Engineering Department, Louisiana State University, W. W. Popych, Mechanical Engineer and Head of the Mechanical Engineering Department of National-U. S. Radiator Corporation; Charles Craig, Jr., Mechanical Engineer, employee of H. E. Bovay, Jr., Consulting Engineer, Horatio N. Ogden, Mechanical Engineer and John G. Blanche, Jr., Mechanical Engineer, at atmospheric pressure, (approximately 14 pounds per square inch) water boils or turns to steam at 212 degrees Fahrenheit and because of the natural thermodynamic characteristics of water there is a relationship between water pressure and the temperature to which water can be elevated before it turns to steam. According to the scientific principles involved, as previously stated; water at atmospheric pressure (in an open container) will vaporize at 212 degrees F., whereas water under 45 pounds pressure (the pressure in the hospital system) will not turn into steam until heated to 292 degrees F. As a corollary of this principle it is impossible to have high water temperature without high pressure but it is possible to have high pressure at low water temperature. It is also shown that under 45 pounds pressure water heated to 212 degrees will not boil in its container but that if released into the atmosphere it will immediately turn into steam. All parties concede the temperature of the water in the boiler was at least 212 degrees at the time of the explosion otherwise Day could not have been scalded with live steam as the evidence indicates. It is further conceded that with circulation in the system the temperature or heat rise of the water in the system would be at the rate of 1.4 degrees per minute considering the water was in motion and the heated water emerging from the boiler would be mixing with the colder water in the storage tank and distribution lines until the temperature of the entire content of the system was stabilized. The experts further agreed that the system being closed there would be practically no gravity or natural circulation whatsoever so that when the pump was not in operation the water in the boiler would be virtually trapped therein and would not flow from the boiler to the storage tank; under such circumstances the 30-gallon content of the boiler would receive the entire heat output of the burner and the temperature of the water in the boiler would then rise at the rate of 17 degrees per minute. These calculations are made by application of the same mathematical formula, namely, by multiplying the heat output of the boiler (216,000 BTU per hour) times the amount of water in the system to determine the rise with circulation and the same BTU output times the volume of water in the boiler only to determine the rise without circulation. It further appears that accompanying the rise in temperature of water in a closed system, pressure increases according to an accepted formula according to which water under 50 pounds pressure per square inch will not boil until heated to approximately 297 degrees. It is further shown that in a closed system pressure is equal throughout; that opening any part of the system such as a faucet or outlet or the occurrence of a leak at any point will reduce pressure in the whole system, and that as water is heated in a closed system pressure therein increases at such rate that commencing with water under 45 pounds pressure at 70 degrees temperature and assuming the system to be absolutely air tight, pressure in the system would rise as follows:

Temperature Pressure Per Square Inch
 80° F. 47
 90° F. 100
 99° F. 225
101° F. 465
102° F. 940

All of the experts agreed that with a pressure relief valve on the boiler set to operate at 50 pounds pressure per square inch pressure could never exceed 50 pounds *122 and the explosion could not have occurred. The explanation offered is that each time pressure rose to 50 pounds the pressure relief valve opens discharging a few drops of water simultaneously permitting the escape of excess pressure and reducing pressure below 50 pounds following which occurrence the pressure relief valve closes and remains closed until pressure again ascended to 50 pounds and the cycle of opening and closing of the pressure relief valve would be repeated ad infinitum. With such a protective device in operation pressure would never exceed 50 pounds regardless of the temperature of the water.
The boiler in question was rated as having a working pressure of 50 pounds per square inch and although not admitted by plaintiff the testimony shows boilers of the type involved are shipped dismantled for assembly by the user after testing of each component part to a pressure equal to two and one-half times the working capacity thereof. According to the manufacturer's procedure and policy each part of the boiler in question was tested to 125 pounds per square inch (its working pressure being 50 pounds). Boilers of this type are shown to have an actual safety factor of five to six times the rated working capacity specified by the fabricator and company records of tests indicate the average destructive pressure of this particular boiler type to be approximately 300 pounds per square inch.
All of the expert witnesses were of the opinion the explosion was inevitable in view of the absence of a pressure relief valve on the boiler as called for by the plans and specifications.
It is undisputed that following the accident only the boiler and White Rodgers gas valve were replaced, both having been destroyed in the explosion. All remaining parts of the system including the Penn control, McDonnell-Miller temperature relief control, Minneapolis-Honeywell Aquastat, Century electric motor and Jacuzzi Brothers pump were found to be in good operating order and permitted to remain on the system. A new boiler was installed, equipped with a pressure relief valve set to operate at 50 pounds and a high limit temperature control (as called for in the plans and specifications) and as thus reconstructed the system has operated since the accident without further incident.
It will be recalled the explosion occurred at a time interval estimated at between 30 and 45 minutes following the lighting of the fire; approximately 20 minutes after the fire was turned on the temperature of the water had risen to 90 degrees; with circulation the temperature of the water rose at the rate of 1.4 degrees per minute and without circulation the temperature rise of the water in the boiler would be 17 degrees per minute. The experts are in agreement that the maximum time lapse having been fixed at approximately 40 minutes, it is certain that circulation stopped after Burkett left the equipment room. They point out there must have been circulation when the boiler was first lighted by Burkett otherwise the explosion would have occurred much sooner because without circulation only the water in the boiler would be receiving heat from the moment the fire was applied and temperature from the beginning would have risen at the rate of 17 degrees per minute. Under such circumstances, after the fire had burned for 20 minutes the temperature of the water would have been far in excess of the 90 degrees noted by Burkett. Using the shortest time estimate of 30 minutes, there would have been a temperature rise of only 42 degrees had circulation continued. Predicated on the maximum estimate of 45 minutes the temperature rise would have approximated 56 degrees with circulation which increase added to the normal temperature of approximately 70 degrees, would have placed the temperature of the water considerably below 212 degrees at the time of the explosion.
*123 The experts unanimously agree that even with circulation the explosion was inevitable because of the manner in which the system was constructed. They all stated that, assuming all component parts performed their respective functions, the explosion would nevertheless have eventually occurred because of the absence of a pressure relief valve on the system. They explain that with no pressure relief valve continued application of heat would cause pressure to rise according to the table hereinabove set forth until the limit of the weakest part of the system was exceeded whereupon an explosion would result. They further state that in the case at bar the weakest part of the system was evidently the boiler since it was the boiler which finally yielded to the rapidly mounting pressure. In addition the experts agree that with cessation of circulation the Penn control, McDonnell-Miller control and Minneapolis-Honeywell aquastat could not perform their proper functions because when forced circulation stopped there would be virtually no flow of water from which it follows that the increase in temperature of the boiler water would not be transmitted to the water in the storage tank, distribution lines and return lines. With the water thus locked or trapped in the boiler the controls mentioned would never become aware of the temperature change taking place in the boiler.
In substance plaintiff contends that since it is conceded the boiler water reached at least 212 degrees this in itself constitutes proof of failure of each control device. Counsel for plaintiff argues that with circulation and a water temperature of at least 212 degrees, it follows that temperature exceeded the highest setting of all regulatory devices (the highest being the McDonnell-Miller control set to fully open at 208 degrees). Learned counsel strenuously argues that with circulation the Penn control failed to cut off the fire when the temperature reached 165 degrees, the McDonnell-Miller control failed to commence opening at 188 degrees and fully open at 208 degrees and the aquastat failed to cut off the pump when the temperature reached 145 degrees. In this connection we wish to point to what we deem an obvious inconsistency in the position of learned counsel for plaintiff. For one purpose he maintains there was circulation in the system (to show failure of those control devices whose operation was dependent upon the flow of water) while for another purpose (to show failure of the pump) he takes the position there was a failure of circulation. The answer to this argument is first, the evidence conclusively shows there was a failure in circulation subsequent to the time the water attained a temperature of 90 degrees and thereafter none of the controls could perform their allotted purposes and secondly, the evidence of plaintiff's own witness Grantham is to the effect the pump was operating at the time of the explosion. Furthermore, an investigation conducted following the accident shows that all controls except the White Rodgers gas valve were undamaged and used on the reconstructed system.
Although the evidence shows beyond doubt the explosion was caused by a failure in circulation the reason for such failure is not conclusively established by the evidence. If we accept the testimony of Grantham (and we have no reason to do otherwise) it is certain that circulation did not stop because of a failure of any part of the pump assembly for the evidence of Grantham shows the pump was running at the time of the explosion.
The testimony does not indicate with any degree of certainty how circulation could have stopped with the pump in operation although two possibilities are suggested. It was testified that development of an "air lock" could have caused circulation to stop even with the pump operating. In this regard, the evidence shows that if sufficient air was permitted to enter the system blocking of circulation could result therefrom. There is testimony to the effect that when Burkett disconnected the pump on the morning of the accident air *124 may have entered the lines causing an "air lock". However, it appears from the evidence that although it was possible air locking could have occurred in this manner, the probability of such occurrence is extremely remote considering the size of the lines and Burkett's testimony that he closed the valves before removing the pump. Another possibility suggested was to the effect that Burkett may have closed one of the valves before leaving the equipment room or that after Burkett's departure, Day or Grantham may have inadvertently closed a valve.
Application of the doctrine of res ipsa loquitur does not necessarily imply defendants are required to fully and completely explain the occurrence of the accident to escape liability to plaintiff. It suffices if defendants rebut the inference of negligence resulting from the application of the rule and plaintiff fails to establish the negligence of defendants. If the evidence as a whole reflects defendants' freedom from negligence constituting a proximate cause of the injury, plaintiff may not recover, because even when the doctrine of res ipsa loquitur is applicable, negligence of the defendant must be proved by a preponderance of the evidence, although such proof be supplied by the unrebutted inference of negligence arising from the circumstances surrounding the occurrence of the accident. In the case presently under consideration, we believe the evidence as a whole fails to show negligence on the part of any of the various manufacturers made defendants herein. On the contrary, the evidence shows each said defendant has successfully rebutted the inference of negligence arising from application of the res ipsa loquitur doctrine and establishes negligence on the part of others.
The alleged negligence of the architect is another matter. Plaintiff contends the various deficiencies in design hereinbefore mentioned constitute negligence on the part of both architect and engineer. In this regard, plaintiff points to the testimony of certain expert witnesses to the effect the design could have been improved by incorporation of the omitted features into the system or elimination or correction of the defects specified. However, these same witnesses testified that although the system could have been improved in the various respects mentioned, the explosion would not have been prevented or avoided thereby unless a pressure relief valve had also been installed on the system in accordance with the plans and specifications. In view of this testimony, we must hold that if there was negligence in the design of the system such negligence was not a proximate cause of the accident.
Plaintiff further contends both architect and engineer were negligent in failing to adequately and properly supervise installation of the domestic hot water system. In this connection plaintiff points to the testimony of both architect and engineer who stated neither was aware the system was being installed and neither inspected the system during installation or after completion. We agree with learned counsel for plaintiff that such gross laxity, indifference and inattention to an assumed obligation constituted negligence on the part of the architect. The terms and conditions of the architect's contract with the Building Authority clearly imposed upon the architect the obligation of supervising installation of all plumbing and heating facilities. Employment of the engineer as required by the terms of the contract between the architect and the Building Authority did not relieve the architect of the burden of supervision since the nature of the engineer's relationship to the architect was, under the circumstances herein shown, essentially that of an agent to whom had been delegated a duty primarily undertaken by the architect as principal.
In addition to the negligence of the architect in failing to properly supervise the work (either through his own efforts or those of the consulting engineer), the architect was guilty of further negligence in approving the brochure despite two prior *125 disapprovals thereof by the consulting engineer. In this connection, we wish to point out the testimony of the architect clearly shows approval of brochures is the duty of the engineer because the architect is not as well informed as the engineer regarding such technical installations. Despite an admitted lack of knowledge regarding such matters, the record establishes it was the architect and not the engineer who approved the brochure pursuant to which Vince made the installation. The negligence of the architect in the respects shown was a proximate cause of the accident rendering the architect liable in damages to plaintiff.
Under the circumstances shown in this particular case, we find plaintiff has failed to establish actionable negligence on the part of the engineer. In substance, two basic charges of negligence are lodged against defendant engineer. First, failure to prepare detailed plans which charge is based primarily upon failure to indicate desired piping details on the blueprint plans and, secondly, failure to provide adequate supervision. Regarding the former, we find that failure to set forth a proposed method of connecting the component parts of the domestic hot water system was not a proximate cause of the accident since all witnesses concede the cause of the explosion was Vince's failure to install a pressure relief valve on the system. With respect to supervision, the engineer is exonerated from negligence because the terms of his contract obligated him to inspect the system only when advised of its final completion or otherwise requested by the architect. The record clearly establishes the engineer was never advised of the completion of the system and had not been requested by the architect to make any inspection whatsoever.
The architect maintains failure to supervise installation of such a device was not negligence since it is customary in the professions to make only periodic inspections and according to the usual and ordinary practice of architecture and engineering, no inspection was called for until the system was complete and the sub-contractor requested final inspection. They further argue that had they inspected the work during installation and directed attention to the fact that the pressure relief valve had not been placed on the boiler, the sub-contractor would have explained its absence by replying that he had not yet completed his work and the device would be placed in position before final inspection was requested. The answer to this argument on behalf of the architect is simple and fundamental. Custom cannot prevail in the face of positive law and conduct constituting the proximate cause of injury of one toward whom a duty of care is owed renders the wrongdoer liable in damages to the injured party, irrespective of whether such conduct is in accord with accepted standards and procedure in any given profession or professions.
The architect maintains he should be released herein because the evidence shows Vince was negligent in failing to install a pressure relief valve on the system. We agree that the record is replete with evidence of gross, inexcusable negligence on the part of Vince but this can be of little comfort to the defendant architect. The negligence of the architect combined with that of Vince in contributing to the injury and renders him liable in solido. It is basic law that one whose negligence combines with that of another to cause injury cannot plead the negligence of such other as a defense to an action by the injured party.
The lower court awarded plaintiff $39,204.68, individually, $9,500 for the use and benefit of the minor Judy Dianne Day and $10,000 for the use and benefit of the minor Randall Joseph Day. Our brother below did not itemize these damages. Plaintiff complains the awards were inadequate and we are inclined to agree.
In her petition, plaintiff specifically prays for damages (both for herself and the *126 minor children of her marriage) for loss of support, loss of the love, affection and companionship of the husband and father and for physical pain and suffering experienced by the decedent from the time of injury to the time of death. In addition, she prayed for and proved special damages in the sum of $352.60 (medical expense) and $1,130.68 (funeral expense) a total of $1,458.28 which she is entitled to recover individually.
On the date of his death, decedent Willie Day was 30 years, 6 months and 4 days old. According to the American Experience Mortality Tables appearing in our revised statutes LSA-R.S. 47:2405, his life expectancy was (for all practical purposes) 35 years. The evidence shows decedent was an apprentice plumber who earned $3,707.54 during 1953, $4,026.13 during 1954, and $3,830.03 in the year 1955. The minor Judy Dianne Day was approximately 5½ years old on the date of her father's death, her brother, Randall Joseph Day, was approximately 2½ years old.
Counsel for plaintiff contends we should follow the procedure suggested in Jones v. Kansas City Ry. Co., 143 La. 307, 78 So. 568; Marler v. State, La.App., 78 So.2d 26; Duree v. State, La.App., 96 So.2d 854 and Stephens v. Natchitoches Parish School Board, La.App., 110 So.2d 156. These cases clearly recognize the difficulty of determining the amount of damages which should be awarded a wife and minor children for loss of support occasioned by the wrongful death of the husband and father.
In the Jones case, supra, our Supreme Court recognized the generally accepted rule that damages to be awarded for wrongful death are in the nature of compensation to dependents for pecuniary loss, both immediate and prospective, sustained as a result of the decedent's death and so far as the loss is prospective, it should be reduced to its present worth. The Jones case, supra, involved the death of a 56 year old railroad engineer having a normal life expectancy of 11.7 years (his professional life expectancy being shown to be only 8 years) and a gross annual income of $2,100. In computing the amount to be awarded the surviving widow and children for loss of support, the Supreme Court arbitrarily concluded decedent annually spent $600 for his own personal use and, therefore, considered the loss of benefits to the widow and children to be $1,500 per year which sum, multiplied by decedent's life expectancy of 11.7 years resulted in a gross monetary loss of $17,550. The Supreme Court further concluded that to reduce the gross anticipated benefits to their present value, the $1,500 annual payments are to be discounted at the reasonable and fair rate at which the money could be loaned or safely invested, which discount rate was fixed at 5%. Using a discount rate of 5% and .05 as a constant annual rate of increase of the divisor, the Supreme Court determined the present value of $17,550 to be $13,547.64 and awarded said amount to the widow and children.
In the Marler case, supra, the Court of Appeal, Second Circuit, awarded a 50 year old surviving widow $30,000 for loss of support of her 61 year old husband. In determining the amount of the award, the court, citing and relying upon the Jones case, supra, computed the husband's prospective earnings at $67,500 by multiplying the amount of his annual earnings by his life expectancy. The court further concluded that applying the formula used in the Jones case, the wife's share in her husband's prospective earnings during his life expectancy would be no less than $30,000 and awarded her said amount for the loss of her husband's support.
In the Duree case, supra, we took the position there is no formula or criteria that must of necessity be adopted for computing the estimated future earnings of a decedent in every case. In effect, we recognized that whereas uniformity in such cases is desirable it is, in fact, impossible because of the imponderables present in each case.
The Stephens case, supra, offers a formula in the interest of a standard of accuracy *127 and with the hope of its acceptance as a uniform basis for all future awards. It is a refinement of the formula used in the Jones case and while we accept it as being of greater accuracy than the formula applied in the Jones case, we do not accept the principle that the gross prospective earnings of a decedent thus determined should, in every instance be used as the measure of an award of damages to the widow and dependents for loss of support and earnings of the decedent. We believe that gross prospective earnings as thus computed should be considered in each case along with all of the other evidence of record including, but not limited to, the age and physical and mental condition of the respective dependents.
We shall proceed to determine the pecuniary loss to the widow in accordance with the formula suggested in the Stephens case merely to consider the result thereof together with all the evidence of record. Considering the wage record of decedent for the three years prior to his death, we believe it fair to accept the sum of $4,000 as his annual wage from which it follows that said decedent having a life expectancy of 35 years would have earned $140,000 during his lifetime. Mrs. Day would be entitled to half said amount or $70,000. Using $70,000 as the figure to be discounted and 16.37419429 as the present value of one, taken at a 5% discount for 35 years, the loss of earnings and support to Mrs. Day is the sum of $32,748.39. Considering the record in its entirety, we conclude Mrs. Day is entitled to an award of $30,000 for loss of her husband's earnings and support.
Learned counsel for plaintiff contends that in fixing the awards to the minors Judy Dianne Day and Randall Joseph Day for loss of support, we should fix the amount at the sum of the present annual Federal income tax deduction per child which is $600 per year on which basis Judy Dianne Day being 5½ years old and entitled to support for 15½ years should be awarded $9,300 and Randall Joseph Day, being 2½ years old and entitled to support for 18½ years should be awarded $11,000. While we do not necessarily accept this method as being applicable to or controlling in all instances, we believe the amounts thus determined are reasonable in the light of the circumstances of this particular case and will award said amounts to said minors, respectively.
We next consider the amount to be awarded the widow and minors for loss of the love, affection and companionship of decedent. The amount of $10,000 awarded each, granted the widow and children in the Stephens case is deemed somewhat excessive in the light of the circumstances of the case at bar. We believe an award of $7,500 to the widow and $6,000 each to the minors will do substantial justice to all parties.
We agree with distinguished counsel for plaintiff that an award should be made the widow and minor children for the pain and suffering of decedent between the time of his injury and death.
In this regard, the evidence reflects decedent received third-degree burns over 90 per cent of his body. The only portions of his body not affected were his armpits and that portion of his feet protected by his shoes and socks. Upon being taken to the hospital, he was found to be in shock and was promptly administered fluids, plasma, blood and a general anesthetic to ease his pain. The top layer of skin was surgically removed from his entire body. Cannulas were placed in his veins to facilitate administration of medication after dressings were applied following which Day's entire body was covered with vaseline, then with plastic dressing, fluffy dressing and waste (in the order given) and finally with elastic pressure bandages. Decedent's neck was so badly burned a tracheotomy was performed to permit his breathing without obstruction. The medical evidence shows he was never completely conscious subsequent to his injury and despite the administration of every known medical aid, his suffering was never fully alleviated.
*128 It has been suggested that an award of $15,000 for decedent's physical pain and suffering divided equally between the widow and two surviving children would be proper. We consider this sum slightly excessive and conclude that an award of $12,000 distributed equally between Mrs. Day and her children would accomplish the ends of justice.
The evidence shows Mrs. Day incurred medical expense in the sum of $352.60 and funeral expense in the amount of $1,130.68 which sums she is entitled to recover in addition to the other awards herein made.
We recapitulate the awards made for the various items of damage by plaintiff as follows:

 (1) To plaintiff individually:
 a. Loss of support ...... $30,000.00
 b. Loss of society ...... 7,500.00
 c. Claim of decedent for
 pain and suffering ... 4,000.00
 d. Medical expense .......... 352.60
 e. Funeral expense ........ 1,130.68
 __________
 Total $42,983.28
 (2) To plaintiff for the use and
 benefit of the minor Judy
 Dianne Day
 a. Loss of support ...... $ 9,300.00
 b. Loss of society ........ 6,000.00
 c. Claim of decedent for
 pain and suffering ..... 4,000.00
 __________
 Total $19,300.00
 (3) To plaintiff for use and
 benefit of minor Randall
 Joseph Day
 a. Loss of support ...... $11,000.00
 b. Loss of society ........ 6,000.00
 c. Claim of decedent for
 pain and suffering ..... 4,000.00
 __________
 Total $21,000.00

Since we have increased the awards made to plaintiff individually and in her capacity as tutrix of her minor children, the judgment of the lower court in this regard must be amended.
As previously stated herein, plaintiff has appealed the judgment of the lower court in favor of intervenor North River Insurance Company, compensation insurer of Vince Plumbing Company, awarding said intervenor judgment against plaintiff for medical expense and compensation paid or to be paid due to the injury and death of plaintiff's deceased husband, Willie Day.
In this regard, the position of learned counsel for plaintiff is based on the premise that an employer whose negligence is a proximate cause of the employee's injury should not be permitted to recover from a third party whose negligence also contributed to the injury, such amount as the employer shall have been compelled to pay the injured employee in compensation.
Conceding the rule advocated by counsel for plaintiff has been adopted in other jurisdictions, it appears the jurisprudence of this state has been established to the contrary.
Workmen's compensation legislation was first introduced in this state by virtue of the provisions of Act 20 of 1914, LSA-R.S. 23:1021 et seq. In 1919, the Supreme Court of this state in the case of City of Shreveport v. Southwestern Gas & Elec. Co., 145 La. 680, 82 So. 785, 789, interpreted the provisions of Section 7 of the original act to confer upon the employer the subrogated right to recover from a third party compensation paid the employee in those cases wherein the employee was paid compensation and awarded damages from the third party. The following language appearing in the above cited case is deemed particularly appropriate.
"Section 7 of the act recognizes the right of the person injured to obtain compensation from his employer and to proceed at law for damages from third persons for his injuries; and, in the event that the injured person has recovered compensation from his employer and damages from a third person, the employer becomes subrogated to the rights of the injured party *129 against said third person to the extent of the compensation made by the employer."
In the City of Shreveport case, supra, the Supreme Court found as a fact that the City was suing under a conventional subrogation from the widow of the deceased employee and despite the fact negligence of the employer was alleged, permitted recovery by the employer against the third party.
The present pertinent provisions of our compensation law are found in LSA-R.S. 23:1101-1103, inclusive, which collectively provide in effect that either the employer or employee may bring suit against the third party responsible for the employee's injuries and that in the event of suit by either the other shall be notified in writing. The right of either employer or employee to intervene in a suit brought by the other is specifically granted. It is further provided that in the event of suit by the employee, damages recovered from the third party shall be apportioned so that the claim of the employer for compensation actually paid shall take precedence over that of the injured employee or his dependents and if damages recovered from the third party are not sufficient or are sufficient only to reimburse the employer for compensation actually paid, such damages shall be assessed only in favor of the employer. The act further stipulates that if damages are recovered in excess of the amount necessary to repay the employer, the remainder shall go to the employee.
The next case in our own jurisprudence dealing with this particular issue was that of International Paper Co. v. Arkansas & L. M. Ry. Co., La.App., 35 So.2d 769, 771, decided by our Court of Appeal (Second Circuit) in 1948. In this case, plaintiff-employer sued a third person under the provisions of Section 1103 to recover compensation paid an employee for injuries allegedly inflicted by the defendant's negligence. Defendant filed an exception of no cause of action based on the premise the petition failed to affirmatively allege freedom of negligence on the part of plaintiff employer. The trial court maintained the exception. Our brethren of the Second Circuit opined in effect that the provisions of the statute conferring upon the employer the right to pursue a third party to recover compensation paid, is in the nature of a legal subrogation wherein the rights and remedies of the injured employee against the third party are transferred to the employer. The Court further pointed out that the statute places no limitation or restriction upon the employer's right of recovery except as to the amount that may be recouped. In reversing the judgment of the lower court sustaining defendant's exception of no cause of action, the court held, in substance, that since the employer as subrogee enjoys all privileges and benefits inuring to the employee, the alleged negligence of the employer may not be asserted by the third party in defense of the employer's action.
In the course of the opinion in the International Paper Co. case, the court stated:
"As a general rule the subrogee is figuratively put in the shoes of the creditor which means that all laws applicable to the latter, in the enforcement of rights and remedies, apply with equal force to the former. 50 Am.Juris. 752-753, Sections 110 and 111.
"In the present case the law that bestows upon the employer the right under discussion places no limitation or restriction thereon, save as to the amount. To this extent and in this way the employer is invested with the same rights and remedies as the injured employee would have had had he sued the tort feasor. And, it is our view that the cited jurisprudence applies as well to the subrogee as it admittedly applies to the injured employee."
In Geter v. Travelers Insurance Company, La.App., 79 So.2d 120, this very *130 court established the principle that an employee who has recovered in a tort action against a third party an amount in excess of total compensation recoverable, may not obtain compensation from his employer as the compensation act does not contemplate full recovery by an employee in both tort and workmen's compensation. In the instant case, the awards granted are far in excess of maximum recoverable compensation. It follows, therefore, judgment of the lower court in favor of intervenor was correct.
The lower court also rendered judgment fixing the fees of certain expert witnesses as follows: George F. Mathes, $200; Charles E. Craig, Jr., $100 and Dr. Thomas Y. Gladney, $50, and taxed same as costs. Considering the record, we believe the fees thus fixed to be reasonable and affirm the judgment of the trial court in this regard.
For the reasons herein assigned, the judgment of the lower court dismissing plaintiff's demands against defendants National-U. S. Radiator Corporation, Indemnity Insurance Company of North America, Minneapolis Honeywell Regulator Co., McDonnell and Miller, Inc., Penn Controls, Inc., White Rodgers Electric Company, Liberty Mutual Insurance Company, Jacuzzi Bros., Inc., Century Electric Company and Chesson, Forrest & Holland (a partnership composed of Ben W. Chesson, Joel I. Forrest and Albert W. Holland) is affirmed; the judgment of the trial court fixing the fees of the expert witnesses George F. Mathes, Charles E. Craig, Jr. and Dr. Thomas Y. Gladney at $200, $100 and $50, respectively, and taxing same as costs herein is affirmed; the judgment of the district court in favor of intervenor, North River Insurance Company, against plaintiff Cecelia LeBlanc Day, individually and as Natural Tutrix of the minors Judy Dianne Day and Randall Joseph Day, for workmen's compensation paid through July 14, 1958, in the sum of $3,570, medical expense paid in the sum of $537.60 and attorney's fees in the amount of $500 and all additional compensation payments made subsequent to July 14, 1958, and until execution of this judgment, is affirmed; and the judgment of the lower court in favor of plaintiff Cecelia LeBlanc Day, individually, against defendants Wilson & Coleman (a partnership composed of John F. Wilson and Robert W. Coleman) and Philip Arnold (in the place and stead of Lloyd's of London or Underwriters at Lloyd's London, Philip Arnold being one of the Underwriters at Lloyd's, London, subscribing Policy No. 101166-C) in solido, in the sum of $39,204.68, with interest and costs, in favor of plaintiff Cecelia LeBlanc Day as natural tutrix of the minor Judy Dianne Day against said same defendants, in solido, in the sum of $9,500, with interest, and in favor of plaintiff Cecelia LeBlanc Day as natural tutrix of the minor Randall Joseph Day and against said same defendants, in solido, in the sum of $10,000, with interest, is amended and judgment rendered herein in favor of plaintiff Cecelia LeBlanc Day, individually and against defendants Wilson & Coleman (a partnership composed of John F. Wilson and Robert W. Coleman) and Philip Arnold (in the place and stead of Lloyd's of London or Underwriters at Lloyd's London, Philip Arnold being one of the Underwriters at Lloyd's, London, subscribing Policy No. 101166-C), in solido, in the sum of $42,983.28, with interest thereon at 5 per cent per annum from date of judicial demand, until paid, and in favor of plaintiff Cecelia LeBlanc Day as natural tutrix of the minor Judy Dianne Day, against defendants Wilson and Coleman (a partnership composed of John F. Wilson and Robert M. Coleman) and Philip Arnold (in the place and stead of Lloyd's of London or Underwriters at Lloyd's London, Philip Arnold being one of the Underwriters at Lloyd's London, subscribing Policy No. 101166-C), in solido, in the sum of $19,300, together with interest thereon at the rate of 5 per cent per annum from date of judicial demand, until paid, and in favor of plaintiff Cecelia LeBlanc Day as natural tutrix of the minor, Randall Joseph Day, against defendants Wilson and Coleman (a *131 partnership composed of John F. Wilson and Robert M. Coleman) and Philip Arnold (in the place and stead of Lloyd's of London or Underwriters at Lloyd's London, Philip Arnold being one of the Underwriters at Lloyd's London, subscribing Policy No. 101166-C), in solido, in the sum of $21,000, together with interest thereon at the rate of 5 per cent per annum from date of judicial demand, until paid, costs to be paid by defendants Wilson & Coleman (a partnership composed of John F. Wilson and Robert M. Coleman) and Philip Arnold (in the place and stead of Lloyd's of London or Underwriters at Lloyd's, London, Philip Arnold being one of the Underwriters at Lloyd's London, subscribing Policy No. 101166-C), in solido.
Judgment affirmed as amended.
TATE, Judge (concurring).
Aside from any other basis of liability, the evidence shows that the negligence of the defendant-architects in approving the plumbing subcontractor's shop drawings was responsible for the absence of the pressure-relief valve upon the domestic hot water system, and that such negligence was thus a proximate cause of the explosion.
For, as all the experts agreed, the boiler exploded so shortly after it was lit because the domestic hot water system was not equipped with a pressure-relief valve. All engineering and plumbing witnesses agreed that a pressure-relief valve is an elementary and necessary safety precaution in the use of water-heating equipment. Such a valve releases pressure (plus some water) whenever the pressure within the water-heating system exceeds the limit for which the valve is set.
Pressure in a water-heating system results from the physical properties of water. Heated water expands, but (in a closed system such as the present) has no place to go due to the incompressibility of the other water in the system. Therefore heating the water results in pressure upon the boiler, tanks, and piping of the system. In the absence of a pressure-relief valve, this pressure, increasing as the water becomes hotter, will eventually cause the system to burst at its weakest pointthe boiler, in the present instance.
Vince, the plumbing subcontractor, himself admitted that he would not have lit the boiler except for his belief that the "temperature-relief valve" was also a pressure-relief valve. A temperature-relief valve is activated to release water (and consequently some pressure also) by excessive temperature, but not by pressure. That safety mechanism herein, placed on the storage tank, was not activated by the dangerously high temperature of the water in the boiler because there was no circulation between the boiler and the storage tank due to a "reverse loop" in the piping and to the absence of gravity circulation between the boiler and the storage tank. Thus, as installed, the boiler was a time-bomb inevitably to explode.
The installation of the boiler so as to constitute it a lethal device, so foreseeably endangering the lives of those nearby, is directly attributable to the failure of the architects to perform their contractual duty of "adequate supervision of the execution of the work" by "checking of all shop and setting drawings" (P-1, Architect's contract, Par. 3(d)); which duty could only be adequately performed in the case of plumbing and heating fixtures by submitting the shop drawings to the engineering consultant for his approval (see P-1, Architect's Contract, "Engineering Services"). As this opinion shall attempt to demonstrate, Vince's tragic mistakehis failing to install a pressure-relief valve and his relying upon a temperature-relief valve with a somewhat similar nomenclature[1] to perform *132 the necessary safety function of the formeris directly attributable to the failure of the defendant-architects to submit to the engineer the third set (P-6, also P-12) of shop drawings prepared by Vince (his earlier two submissions, P-4 and P-5, having been disapproved by the engineer for various inadequacies). These final shop drawings, which the architect approved without consulting the engineer, did not require a pressure-relief valve for the domestic hot water heating system.
(Albert Blache, representative of the firm that prepared the shop drawings for Vince, testified positively that the fly sheet of Vince's final "brochure"as the shop drawings are interchangeably denoted throughout the record, cf. Tr. 37did not specify a pressure-relief valve for the domestic hot water heating system, and that the pressure-relief valves listed by the brochure were for use in the space heating system. Tr. 309-310, 319-320. This testimony is uncontradicted in the record. Although Vince initially testified that one of the two "230M McDonnell Miller ASME relief valve" specified by the brochure was for the hot water system, he eventually admitted that he did not know for what system these valves were intended. Tr. 407. As Blache had previously noted, they were indeed for use with the space heating system, not the hot water heating system. Tr. 309-310. This is further corroborated by the McDonnell-Miller catalogue introduced in evidence, which shows that the "230M" valves were for "hot water space heating boilers" and had an opening pressure of 30-36 pounds per square inch, as contrasted to the "230" valves for "hot water tanks and heaters" with opening pressures of 75 pounds and up: a space heating system, relying on steam, maintains a normal working pressure of about 15 pounds, to which a pressure-relief valve set at 30 pounds provides a safety relief when the normal pressure rises; a water heating system has a higher normal working pressurein the present instance, 45-50 pounds, so that a pressure-relief valve designed to release excess pressure must have a higher opening pressure. See Exhibit McDonnell-Miller No. 5, p. 22. In fact, the pressure-relief valves installed on the domestic hot water system after the explosion, and presently in use, are set with an opening pressure of 125 pounds per square inch. Tr. 1344, 1372.)
It is advisable at this point to elaborate a little concerning the function of the shop drawings or brochures. They were the medium by which the complex plans and specifications, couched in legal and architectural and engineering terms and upon which the contract was bid, were translated into working specifications and instructions for the contractor and construction crews on the job. Both the general contract and the architect's contract provided that the contractors should prepare and the architect should check shop drawings of the work to be performed, and that the contractor should not proceed with the work until securing the approval of the architect. (See P-3, general contract, at 29-2, pink pages; P-1, architect's contract, at par. 3 (d).) The architects and the engineer testified that they in large part performed their contractual duty of inspecting the equipment to be installed by checking these shop drawings, and approving or disapproving same. Tr. 32-33, 37, 74-75, 148-9.
Because of this function of shop drawings, clearly unfounded in practice is the argument that the notation in Vince's final shop drawings that the boiler "w/H.W. Controls, 270 MBH Input as per plans and specifications" was sufficient indication to Vince of the necessity that a pressure-relief control be installed upon the hot water boiler.[2] It is to be seen, for instance, that *133 in all of Vince's initial and final brochures four pressure-relief valves were individually specified for the space heating system (see P-4, P-5, P-6 and P-12), even though the general specifications for such system similarly to those of the hot water system called for pressure-relief valves (see P-3, general contract, at pages 30-4 and 30-5, yellow pages.) Actually, an additional pressure-relief valve for the hot water system was correctly listed as required on the shop drawings initially submitted by Vince (P-4, see footnote 1 above; Tr. 1329) and disapproved for other causes; although this essential valve was omitted through clerical or other error on subsequent submissions by Vince.[3]
If the argument is made that the architect Wilson approved Vince's final shop drawings in the belief that the reference to the plans and specifications sufficiently indicated that Vince was going to install a pressure-relief valve, then under the record Wilson negligently performed his duty of supervising installation of equipment. A skilled engineer had to check the shop drawings in order to assure that the equipment to be installed by the contractor complied with the specifications and would perform its proper engineering and safety functions. This assured proper engineering inspection of the equipment because the "clerk of the works" (who, although a skilled construction man, was untrained in engineering; and who served as the architect's representative on the job-site during every hour of the working day) could check the equipment received on the job for installation and be assured that the equipment (if the same as that listed in the brochure) met the contract specifications since approved by the architect. All the equipment to be installed had to meet the general plans and specifications, but the checking of the shop drawings by the architect was to translate these general requirements into specific equipment and material approved for installation by the contractors as completely complying with the specifications called for by the general contract.
*134 The necessity of having a skilled engineer check the specific equipment the contractor intends to install is graphically shown by the present record. Vince installed the 201 NF Relief Valve in the belief that it was a pressure-relief valve as well as a temperature-relief valve, whereas actually it performed only the latter function. (That this inaccuracy was not due to any unusual ignorance on Vince's part is shown by the circumstance that the same mistake as to function was made by Craig, an engineer hired by an insurance company to investigate and determine the cause of the explosion immediately after it occurred. See P-16, Bovay Report.) Again, Vince believed that the 230M pressure relief valves shown by his shop drawings could be used for a hot water heating system, whereas they were not suitable for such purposes. Further, the appurtenances of the boilers of different manufacturers varied, some having certain safety controls as standard equipment and others not. (In the present instance, the space heating boiler has as standard equipment a pressure-relief valve supplied with it; the hot water heating boiler did not. See the individual descriptions of such boilers in brochures P-6 and P-12.)
Undoubtedly, if the architects had submitted Vince's final brochure to the engineer, the latter in the proper performance of his function would have noted the absence of any pressure-relief valve for the domestic hot water heating system. As did the present writer, he would have checked the description of the hot water boiler in the brochure and would have found that it did not come supplied with a pressure-relief valve; he would have checked the catalogue descriptions of the pressure-relief valves specifically listed on the brochure, and would have found that none could be used on the domestic hot water heating system and that those specified were for use on the space heating system; and he would have required the shop drawings to show that the hot water system was to be equipped with a pressure-relief valve before he approved them. (That this is the manner in which the engineer performed his inspection and approving of equipment to be installed is well illustrated by the letters of disapproval in the record: see P-5A, where the engineer in disapproving certain brochures commented, "Controls: Additional information is requested as to catalogue model and numbers. We will retain these brochures until this information is received"; see P-4A, where absence of equipment required by specifications was one of the reasons for disapproval of brochure, e.g., "No pump was included for the domestic hot water circulator.")
It is conceded by defendants-appellants that inspection and approval of shop drawings for water-heating installations fell within the competency of the engineer and not the architect. Wilson himself admitted he was totally incompetent to determine whether a water-heating system was safe or adequate. (He at first denied having approved Vince's final shop drawings, but eventually admitted that the approving signature was his own.) It was thus the function of the engineer to check the plumbing and heating brochures, and to require that the equipment therein specified comply with the specifications and with the needs of sound engineering; by both of which standards, as the engineer alone was competent to determine, a pressure-relief valve was required. In blindly approving Vince's brochure without submitting it to the engineer, Wilson was grossly negligent in his duty of inspection.
The requirement that trained engineers check the shop drawings of equipment to be used, to assure its compliance with the specifications, was designed to avoid such mistakes as Vince's fatal reliance upon the temperature-relief valve to perform the function of a pressure-relief valve. If, as required by the contract as well as by reasonable prudence, the architects had submitted Vince's shop drawings to the engineer, the absence of a pressure-relief valve for the hot water system should have *135 been discovered and the present accident avoided.
I therefore think that the grossly negligent failure of the architects to require engineering approval of Vince's shop drawings was a direct, proximate cause of Vince's failure to install a pressure-relief valve and of the consequent fatal explosion.
For these reasons, as well as those stated so ably in the majority opinion, I concur in the affirmance of the judgment of the district court holding the defendant-architects and their insurer liable for the damages sustained by plaintiff and her children through the death of their husband and father.

On Application for Rehearing.
PER CURIAM.
An application for rehearing has been filed on behalf of Wilson & Coleman, its partners and insurer.
The application for rehearing is based, inter alia, upon the contention that the court erred in holding the architects negligent for failing to inspect the domestic hot water system during the course of its installation and in holding that such negligence was a proximate cause of the explosion, and also upon the contention that the court erred in holding that (insofar as the architects were concerned) the doctrine of res ipsa loquitur is applicable.
Although these contentions are treated in our original opinion, and although we are not convinced that we are in error in our decision thereof, the application so urgently contends that the import of our decision is to make architects the insurers of the employees of contractors and subcontractors employed on construction projects, that we would be inclined in view of the gravity of the questions raised to grant a rehearing upon these restricted issues; except that we find upon a reconsideration of the whole record that the negligence of the architects in approving the plumbing subcontractor's shop drawings was responsible for the absence of the pressure-relief valve upon the domestic hot water system, and that such negligence was thus a proximate cause of the explosion.
The application for rehearing is therefore denied.
NOTES
[1] The temperature-relief valve was denoted as a "201NF McDonnell-Miller valve".

The type of pressure-relief valve intended to be used herein for the domestic hot water heating system is technically denoted as a "¾ 230 ASME McDonnell-Miller P.R. Valve". See Exhibit P-4; see also Exhibit McDonnell-Miller No. 5, p. 22.
[2] As a matter of fact, the requirement that the boiler have 270 MBH "as per plans and specifications" most certainly refers to the capacity of the boiler itself, not that it be equipped with any accessories called for by the specifications. See Specifications, P-3, at page 29-6, pink pages. The hot water system boiler first proposed by Vince on brochure P-4, dated June 19, 1955, had been disapproved by the engineer because it did "not have the required capacity as specified", P-4A, dated July 4, 1955; and it was to comply with this objection that the notation in question was added to Vince's brochures subsequently submitted.
[3] An effort is made to insinuate that the absence of a pressure-relief valve on Vince's third submission (P-6 and P-12) of his shop drawings is not a proximate cause of Vince's failure to install one on the hot water system, because Vince had shown such valve in his initial set of shop drawings (P4) which had been by the engineers "approved as submitted with the following exceptions" (none of which pertained to the pressure-relief valve.) P-4A. However, as the engineer Chesson and the other construction witnesses testified, such partial approval was only for guidance to the subcontractor for re-submission purposes: A brochure rejected for any partial non-compliance was considered rejected in toto, and a subcontractor's shop drawings were not considered approved for purposes of his proceeding with the work until such shop drawings as corrected were approved in toto. The finally approved complete single set of shop drawings was what was used by the contractor and workmen on the job and "the clerk of the works" (see text below) in the performance and inspection of the work, not the series of submissions including the earlier partially approved ones. Cf., also general contract and specifications, P-3, pages 29-2, pink pages; "* * * Four sets of blue prints of shop drawings shall be submitted [by the contractor] to the Architect for approval. After making corrections, the Architect will return two sets and the contractor shall resubmit in quadruplicate showing corrections and shall continue such submissions until approval by the Architect is obtained. On approval, he shall supply the Architect four complete sets. * * *"